FIFTH DIVISION

March 9, 2001

No. 1-99-0788

PETER ENGELLAND and MARIBETH ENGELLAND, )

)

Plaintiffs, )        Appeal from

)     the Circuit Court

v. )      of Cook County.

)     

CLEAN HARBORS ENVIRONMENTAL SERVICES, )      

INC., a/k/a CLEAN HARBORS, INC., )

)      No. 94-L-11385

Defendant and )

Third-Party Plaintiff-Appellant )

)     

(Waste Management of Illinois, Inc., )         Honorable

d/b/a Waste Management of the South )      Sophia H. Hall,

Suburbs, and Waste Management, Inc., )      Judge Presiding.

)

Third-Party Defendants-Appellees). )

JUSTICE THEIS delivered the opinion of the court:

Peter and Maribeth Engelland brought an action against Clean Harbors Environmental Services, Inc. (Clean Harbors), seeking to recover damages for injuries Peter sustained when he inhaled toxic chlorine gas at Clean Harbors' waste disposal facility.  Clean Harbors filed a third-party contribution action under a negligence theory against Peter's employer, Waste Management of Illinois, Inc. (WMIL).  Prior to trial, Clean Harbors settled with the Engellands for $9 million.  Clean Harbors then proceeded with its contribution action and was granted leave to amend its complaint to add Waste Management, Inc. (WM Inc.), as an additional third-party defendant.  WM Inc. and WMIL (hereinafter defendants) brought motions for summary judgment on the negligence issue and also renewed their affirmative defenses, which had previously been rejected.  The trial court granted both defendants' motions, without stating the basis for its decision.  Clean Harbors then filed a motion to reconsider, which was denied.  Clean Harbors now appeals from the entry of summary judgment in favor of defendants.  We affirm.

Clean Harbors raises five issues on appeal:  (1) whether WM Inc. and WMIL undertook, pursuant to company policy and the Occupational Safety and Health Act (OSHA) (29 U.S.C. §651 
et seq.
 (1994)) regulations, to investigate and warn of any possible risks Peter Engelland (Engelland) might face at Clean Harbors and to train him how to detect and respond to unexpected emissions of toxic gas and whether defendants had a duty to Engelland to fulfill this undertaking with reasonable care; (2) whether defendants breached this duty by failing to inform Engelland that Clean Harbors handled hazardous waste or of the potential risk of an emission of toxic gas at Clean Harbors and did not train him to recognize and respond to an emission of gas; (3) whether the defendants' failure to warn and train Engelland was a proximate cause of Engelland's injury or the severity of his injury; (4) whether the court properly exercised its discretion in finding that Clean Harbors' amended third-party complaint related back to the original, timely filed complaint, pursuant to section 2-616(d) of the Code of Civil Procedure (735 ILCS 5/2-616(d) (West 1994)); and (5) whether the circuit court correctly found that the settlement agreement between Clean Harbors and Engelland served to release WMIL.  WMIL raised an additional issue on appeal:  whether the issue related to the contribution liability of WMIL had been rendered moot by the waiver of its worker's compensation lien.  We find that Clean Harbors' first three issues (collectively, the negligence issue) are dispositive and, therefore, we need only address those issues.

Engelland was employed as a driver by Kankakee Industrial Disposal (KID), a division of Waste Management of the South Suburbs, which was a division of WMIL, a subsidiary of WM Inc.  In that capacity, he hauled both hazardous and nonhazardous waste, as well as collected residential garbage.  Clean Harbors owned and operated a treatment, storage and disposal facility in Chicago which handled both hazardous and nonhazardous waste.  It received its waste from outside sources and then treated and stored it at its facility.  

On April 18, 1994, Engelland, while acting within the scope of his employment, transported a tanker truck of nonhazardous red food dye to Clean Harbors.  Engelland had made several previous deliveries to Clean Harbors in the 2½ years of his employment as a tanker driver.  After checking in and performing all preliminary duties, Engelland was told to dump the dye into one of four adjacent, outdoor pits.  While Engelland unloaded his truck, a Clean Harbors employee, unbeknownst to Engelland, was treating hazardous waste in the adjacent pit.  That employee negligently added chemicals to the waste in the wrong order, causing a chemical reaction and the creation of a chlorine gas cloud.  Engelland smelled a burnt odor, but did not immediately recognize any danger.  He remained outside with his truck until he became engulfed in the chlorine cloud.  After about two minutes of exposure to this toxic gas, Engelland left the pit area and went inside.  Once inside, a Clean Harbors employee told Engelland that the cloud was chlorine gas.  Engelland delayed seeking medical treatment for several hours because he did not fully realize the physical dangers from the gas.  Tests later revealed that he suffered extensive lung damage and would most likely need a double lung transplant.   

 On appeal, Clean Harbors argues the trial court erred by granting summary judgment because each defendant had a duty to investigate and warn Engelland of any possible dangers at Clean Harbors and to train him to adequately detect, appreciate the danger of, and appropriately respond to toxic gases such as chlorine.  Clean Harbors contends that WM Inc. and WMIL voluntarily undertook these duties, pursuant to company policy and statutory regulations, such as OSHA regulation 1910.1200.  29 C.F.R. §1910.1200 (1999).    

A motion for summary judgment should be granted where the pleadings, depositions and affidavits reveal that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  
Frye v. Medicare-Glaser Corp.
, 153 Ill. 2d 26, 31, 605 N.E.2d 557, 559 (1992).  When reviewing a motion for summary judgment, we must take the facts in the light most favorable to the nonmoving party and apply 
de novo
 review.  
Frye
, 153 Ill. 2d at 31, 605 N.E.2d at 559.  "[W]e may affirm the decision of the trial court to grant summary judgment on any basis in the record, regardless of whether it relied on that ground or whether its reasoning was correct."  
Castro v. Brown's Chicken & Pasta, Inc.
, 314 Ill. App. 3d 542, 552, 732 N.E.2d 37, 46 (2000).

Clean Harbors alleges a negligence cause of action against WM Inc. and WMIL.  To establish a claim for negligence, a plaintiff must prove all four elements of the claim:  the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, proximate cause and injury.  
Mt. Zion State Bank & Trust v. Consolidated Communications, Inc.
, 169 Ill. 2d 110, 116, 660 N.E.2d 863, 867 (1995).  We first address whether WM Inc. and WMIL owed a duty to Engelland.  

Clean Harbors argues that WM Inc. and WMIL owed Engelland a duty under the voluntary undertaking doctrine.  Under this doctrine, one who gratuitously, or for consideration, renders services to another is subject to liability for bodily harm caused to the other by one's failure to exercise due care or such competence and skill as one possesses.  
Frye
, 153 Ill. 2d at 32, 605 N.E.2d at 560.  However, this duty of care imposed upon a defendant is limited to the extent of the undertaking.  
Frye
, 153 Ill. 2d at 32, 605 N.E.2d at 560; 
Demos v. Ferris-Shell Oil Co.
, 317 Ill. App. 3d 41, 48, 740 N.E.2d 9, 15 (2000).  "Liability is imposed upon a defendant who voluntarily undertakes a duty but performs the undertaking negligently, if the negligence is the proximate cause of the injury to the plaintiff."  
Decker v. Domino's Pizza, Inc.
, 268 Ill. App. 3d 521, 526, 644 N.E.2d 515, 519 (1994).  The 
Frye
 court also weighed public policy considerations when it adopted a narrow construction of the doctrine.   
Frye
, 153 Ill. 2d at 33, 605 N.E.2d at 560.

Clean Harbors contends that WMIL and WM Inc. voluntarily undertook two duties to Engelland:  (1) a duty to investigate and warn of any possible risks and hazards at Clean Harbors, including unexpected and accidental emissions of toxic gas such as chlorine, and (2) a duty to train Engelland how to detect and properly respond to any unexpected emission of toxic gas.  Both WMIL and WM Inc. deny that they undertook such duties.   

We first address whether WM Inc. voluntarily undertook a duty to investigate and warn.  First, Clean Harbors contends that the evidentiary materials establish that WM Inc. voluntarily undertook to investigate and warn Engelland of 
any
 risks or hazards he might face at Clean Harbors, specifically the accidental emission of chlorine gas.  Clean Harbors relies on the deposition testimony of David Malter, the director of health, safety and transportation for WM Inc. at the time of Engelland's injury.  Malter testified that governmental regulations required the company to warn employees of potential risks of chemical exposure, including accidental exposure.  He also stated that WM Inc. had an obligation to provide a safe and healthful workplace, in partnership with OSHA regulations.  

 However, Malter also testified that the duty to warn drivers was limited to circumstances where WM Inc. obtained information concerning a risk and perceived the risk as exceeding minimum thresholds of harm.  Malter described how WM Inc. evaluated non-WM Inc. sites before beginning deliveries to that site.  According to Malter, a special waste coordinator would visit a non-WM Inc. site, such as Clean Harbors, to assess what risks might face WM Inc. drivers.  In evaluating the non-WM Inc. site, the coordinator relied on the facility to provide WM Inc. with information concerning potential risks.  Malter stated OSHA regulations required a non-WM Inc. facility to provide this precautionary information.  WM Inc. then used this information to identify the potential risks at that facility.  After the evaluation, the coordinator completed a special waste decision logic form containing written warnings about the potential risks that had been identified.  

Based on this testimony, we hold that WM Inc. undertook a duty to investigate and warn Engelland of risks at Clean Harbors.  However, the extent of any duty is strictly limited by the scope of the undertaking.  Here the scope of WM Inc's. duty to warn was much narrower than that urged by Clean Harbors.  The act of undertaking to warn employees of some potential hazards did not impose a duty to warn the same employees as to all unforeseen hazards. 
 To do so would place WM Inc. in the untenable position as an absolute insurer of its employees' safety.  We decline to hold WM Inc. responsible for such an unrealistic task.  Therefore, we hold that WM Inc. assumed a duty to warn of only known, identifiable risks present at Clean Harbors.    

Despite Clean Harbors' claims, there are no facts in the record to prove that WM Inc. or WMIL knew or should have known of the potential accidental emission of chlorine gas at Clean Harbors.  WM Inc. conducted an audit of Clean Harbors' facility and completed extensive paperwork regarding details on the facility before approving Clean Harbors for use by WM Inc.  None of these documents suggest the potential for the unexpected release of any gas.  There is no evidence that WM Inc. or WMIL knew of previous chlorine gas emissions at the facility, or even that these emissions did, in fact, occur.  James Laubsted, who worked at Clean Harbors and its predecessor for 10 years as plant manager and compliance manager, did not know of any prior emissions of chlorine gas at the facility.  Clean Harbors refers us to deposition transcripts of Clean Harbors employees that discuss the chemical processes and potential chemical reactions that may occur at Clean Harbors.  However,  Laubsted stated that the April 14, 1994, release of chlorine was "highly unusual," "[h]appening once in a lifetime of a facility."  He also testified that he was not aware of anything specific that would have alerted WM Inc. or WMIL that chlorine might be created at Clean Harbors. 

 We therefore find that WM Inc. and WMIL had no knowledge of the potential for an unexpected release of chlorine gas at Clean Harbors.  This possible risk was not identifiable or perceived and, therefore, is outside the scope of the duty to warn assumed by WM Inc.

Clean Harbors argues that WMIL voluntarily undertook a similar duty to investigate and warn Engelland of all possible risks at Clean Harbors.  In doing so, Clean Harbors alleges merely that WMIL relied on WM Inc. to advise it of any possibilities of risks at Clean Harbors so it could warn and train its employees.  Further, Clean Harbors asserts that KID and WMIL had warned Engelland of potential hazards at other non-WM Inc. sites.  However, as discussed above, we find that WM Inc. owed no duty to Engelland to investigate and warn of the unknown, unidentifiable risk of a possible chlorine gas emission at Clean Harbors.  Therefore, WM Inc. had no responsibility to inform WMIL of this unknown risk.  Because WMIL had no knowledge of the potential risk, it had no duty to inform Engelland or its other employees of the potential hazard.  We find that WMIL did not voluntarily undertake a duty to investigate and warn Engelland of the possibility of a chlorine gas emission at Clean Harbors.

Clean Harbors next argues that WM Inc. and WMIL voluntarily undertook a duty to train Engelland to detect and respond to accidental releases of chlorine gas.  The record reveals that both WM Inc. and WMIL provided training to Engelland in the form of classes, on-the-job training, handbooks, and manuals.  WM Inc. and WMIL employees received extensive training upon beginning employment with WM Inc. and WMIL.  In fact, Engelland and several other WM Inc. employees stated that Engelland received OSHA right-to-know training when he first started with WMIL, which included reviewing the material safety data sheets for each chemical present at a facility.  Further, employees participated in monthly and annual refresher courses in safety procedures, which included information about new chemicals or equipment.  Engelland and other drivers were required to take a 40- hour OSHA training session upon beginning as a tanker driver. 

Additionally, Jeanne Fallon-Carine, a chemical waste management employee who trained WM employees, testified that the training course taught employees how to detect the presence of chemicals in any work place and how to respond to such chemicals.  She also stated that the hazard recognition portion of the training taught the employees how to smell, taste, see or hear chemicals in their work areas and informed them of different types of monitoring equipment.  The record reveals that employees were trained regarding the physical and health hazards of chemicals in the work area through the reviewing of the material safety data sheets.  Material safety data sheets were created for each chemical present at a facility and contained the quantity present and details about the chemical.  In the 40-hour OSHA training course, employees were trained in hazard recognition, hazard communication, personal protective equipment and emergency response plans.  Employees learned the details of the hazard recognition program, along with an explanation of the material safety data sheets.  Employees were also taught where the hazard information was located at the site and how to use such information.    

During Malter's deposition, he stated that the level of instructions WM Inc. and WMIL would give drivers before they made deliveries to non-WM facilities would depend on how much WM Inc. and WMIL knew about the known, perceived risks at that site.  If WM Inc. and WMIL did not know of the potential for a chlorine gas emission, WM Inc. and WMIL had no obligation to train Engelland to respond to such an unidentified, nonexistent possibility.  Malter testified that, if the potential for exposure was extremely low or nonexistent, WM Inc. had no obligation to train its drivers about the risk.  As Malter stated "it would only be reasonable to expect Waste Management to provide that training [concerning the event of a spill or release of chlorine gas] if indeed they had been advised that there was a potential risk for that location." 

There are very few cases regarding an employer's voluntary undertaking of a duty to train its employees.
  Both parties cite 
Decker v. Domino's Pizza, Inc.
, 268 Ill. App. 3d 521, 644 N.E.2d 515 (1994), 
Martin v. McDonald's Corp.
, 213 Ill. App. 3d 487, 572 N.E.2d 1073 (1991), and 
Frye v. Medicare-Glaser Corp.
, 153 Ill. 2d 26, 605 N.E.2d 557 (1992).  These cases are distinguishable, however, as the first two involve employee security and third-party criminal acts and the third concerns the learned intermediary doctrine and prescription drugs.  None of these cases involves an employer's duty to train or warn its employees.  

The most recent case involving a duty to train is 
Kresin v. Sears, Roebuck & Co.
, 316 Ill. App. 3d 433, 736 N.E.2d 171 (2000).  In that case, a Sears employee in the automotive service department backed a vehicle out of the service doors, which were located immediately next to the pedestrian entrance.  
Kresin
, 316 Ill. App. 3d at 435, 736 N.E.2d at 173.  In doing so, he struck and severely injured an elderly woman who had just exited from the pedestrian doors.  The evidence showed that Sears was aware of the potential danger of the close proximity between the service bay and pedestrian entrance, and it prepared a safety manual and held safety meetings addressing this potential problem.  
Kresin
, 316 Ill. App. 3d at 441, 736 N.E.2d at 177.  The 
Kresin
 court found that, based on the inherent danger posed by the location of the service bay to the pedestrian entrance, Sears was required to provide more instruction to its employees.  The court found the evidence presented established that Sears failed to adequately train and instruct its employees on safety procedures.  
Kresin
, 316 Ill. App. 3d at 441, 736 N.E.2d at 177.

Kresin
 is easily distinguished from the present case.  In 
Kresin
, Sears knew of and identified the known risk of vehicles exiting the service bay and striking pedestrians.  Once aware of this risk, Sears addressed this specific concern with a safety manual and meetings with its employees.  The court found that Sears undertook a duty to train its employees regarding the potential risk of service vehicles hitting pedestrians.  However, in the present case, while WM Inc. and WMIL conducted extensive safety training, they were not aware of the danger of an accidental chlorine gas emission at Clean Harbors and, therefore, could not have specifically addressed that issue through warnings or training.  Therefore, as the risk of such an emission was not known or perceived, WM Inc. and WMIL did not have a duty to train Engelland to detect and respond specifically to a chlorine gas emission at Clean Harbors.  We again decline to adopt Clean Harbors' theory that WM Inc. and WMIL assumed a duty to train their employees regarding any possible risks at Clean Harbors.  The mere act of undertaking to train its employees regarding some potential hazards did not impose a duty to train those employees as to all conceivable potential hazards.

 Clean Harbors asserts a second theory of liability against WMIL.  It argues that WMIL had an additional duty as Engelland's employer to train Engelland to detect and respond to unexpected and accidental emissions of toxic gas under OSHA regulations.  Those regulations state:

"(1) Employers shall provide employees with effective information and training on hazardous chemicals in their work area at the time of their initial assignment, and whenever a new physical or health hazard the employees have not previously been trained about is introduced into their work area. ***

*  *  *

(3) 
Training
.  Employee training shall include at least: 

(i) Methods and observations that may be used to detect the presence or release of a hazardous chemical in the work area (such as monitoring conducted by the employer, continuous monitoring devices, visual appearance or odor of hazardous chemicals when being released, etc.);

(ii) The physical and health hazards of the chemicals in the work area;

(iii) The measures employees can take to protect themselves from these hazards, including specific procedures the employer has implemented to protect employees from exposure to hazardous chemicals, such as appropriate work practices, emergency procedures, and personal protective equipment to be used; and,

(iv) The details of the hazard communication program developed by the employer, including an explanation of the labeling system and the material safety data sheet, and how employees can obtain and use the appropriate hazard information."  29 C.F.R. §§1910.1200 (h)(1), (h)(3) (1999).

Clean Harbors argues that, in order to comply with these regulations, WMIL would have to investigate and determine which hazardous chemicals Engelland might be exposed to at Clean Harbors.  Then, WMIL had a duty under these regulations to train Engelland how to properly respond to unexpected releases.  WMIL failed to respond to this argument in its brief.  

We agree that WMIL did have a duty as Engelland's employer to investigate and warn Engelland of known hazardous chemicals and to provide training to detect and respond to hazards in the workplace, pursuant to OSHA regulations.  However, because the accidental emission of chlorine gas at Clean Harbors was not known or identifiable to WMIL and WM Inc., WM Inc. and WMIL had no duty, under the voluntary undertaking doctrine or OSHA regulations, to warn and train Engelland of this risk.

Because we find that WM Inc. and WMIL did not owe any duty to Engelland regarding the unexpected emission of chlorine gas at Clean Harbors, we need not discuss the other three elements of negligence.  Clean Harbors has not shown any genuine issue of material fact on its negligence claim and, therefore, we find no liability under negligence.  We also need not address the other issues and arguments raised by the parties.  We affirm the trial court's granting of summary judgment in favor of WMIL and WM Inc.

Affirmed.

QUINN, P.J., and GREIMAN, J., concur.