FIRST DIVISION

                                    JUNE 28, 2002

No. 1-01-0650

BRIAN WEEDON,          

         

Plaintiff-Appellant, 

v. 

PFIZER, INC., a Delaware Corporation, and HORIZON MEDICAL PRODUCTS, INC., 

Defendants-Appellees.
 

) Appeal from the 

) Circuit Court of Cook 

) County

)

) No. 98 L 09858

)

) 

) The Honorable

) Mary A. Mulhern,

) Judge Presiding. 

JUSTICE COUSINS delivered the opinion of the court:

Brian Weedon brought an action at law to recover damages from an injury allegedly caused by a defective venous access device.  Pfizer, Inc., and Horizon Medical Products, Inc., the alleged manufacturers of the device, moved for summary judgment claiming: (1) that there was no genuine issue of material fact that the device was defective; and (2) that they did not manufacture the device in question.  The trial court granted the defendants’ motion for summary judgment based on the findings that the plaintiff failed to produce evidence of a defect and all other causes had not been excluded.  Weedon appeals claiming that he produced sufficient circumstantial evidence to create a reasonable inference that the product was defective. 

We reverse and remand.

BACKGROUND

Brian Weedon was diagnosed with Hodgkin's disease in May of 1993.  He was successfully treated with radiation and chemotherapy.  In 1996, Weedon had a relapse of the disease.  Dr. Leo Gordon, an oncologist with Northwestern University Hospital, treated Weedon with chemotherapy.  A venous access service, commonly known as a "Lifeporte,"
(footnote: 1) was surgically implanted into Weedon's chest as part of the chemotherapy.

The Lifeporte was implanted in Weedon's chest beneath the skin by Dr. Talamanti, an oncology surgeon at Northwestern University Hospital.  There is a reservoir through which a nurse or doctor can inject chemotherapy drugs.  The other end of the device traverses the large vein in the neck and enters the large chamber of the heart.  Weedon received regular chemotherapy injections through this device from October 1996 until February 1997.  Sarah Coveny, an oncology nurse, administered the drugs to Weedon through the venous access device.  

After approximately four months of chemotherapy, Weedon began to experience discomfort and swelling near the device.  Dr. Gordon examined Weedon and determined that the device should be removed.  Dr. Talamanti was asked by Dr. Gordon to explant the device.  Dr. Talamanti explanted the device and discarded it before any tests could be conducted for extravasation (leakage).  The device was never recovered.  

After removal of the device, necrosis of the skin, fat and muscle tissue was detected and continued for a period of time.  As a result, Weedon was left with a large hole in his chest.  Dr. Talamanti referred Weedon to Dr. Dumanian, a plastic surgeon, to perform a skin graft and close the wound because Dr. Talamanti thought it would be a very difficult procedure requiring the skill of a plastic surgeon.  After two plastic surgeries, the wound closure was successful, but Weedon was significantly disfigured.  

Dr. Talamanti testified that when he implanted the device, it appeared to function normally.  He checked the device for extravasation and observed none prior to and immediately after implanting the device.  He testified that the placement of the device was proper as evidenced by an X ray following implantation.  Dr. Talamanti testified that there was no evidence that would lead him to believe that the device developed a clot or that the device was malpositioned.  He also did not notice any extravasation when explanting the device.

The plaintiff did not produce any witnesses purporting to be experts in the design or manufacturing of the venous access device.  The plaintiff's witnesses also could not point to any specific defect in the device that caused leakage.  In addition, the doctors that treated Weedon all testified that his injury could have resulted from infection, malpositioning of the device or extravasation.  However, each doctor testified that it was more likely that plaintiff had an extravasation injury than an injury due to infection or malpositioning of the device.  

ANALYSIS

I

Weedon claims that the trial court improperly granted summary judgment in favor of the defendants because he came forward with sufficient circumstantial evidence to create a reasonable inference that the product was defective.  The defendants claim that Weedon: (1) never pleaded a nonspecific defect claim and, therefore, cannot now proceed with such a claim; (2) has presented no evidence that tends to negate the other reasonable causes for his injury; and (3) did not present evidence that the product failed to perform in a manner reasonably to be expected in light of its nature and intended function.  

 A motion for summary judgment should be granted when the pleadings, depositions and affidavits reveal that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  
Frye v. Medicare-Glaser Corp.
, 153 Ill. 2d 26, 31, 605 N.E.2d 557 (1992).  The standard of review of a trial court’s decision granting summary judgment is 
de
 
novo
.  
Schal Bovis, Inc. v. Casualty Insurance Co.
, 315 Ill. App. 3d 353, 364, 732 N.E.2d 1179 (2000).  Summary judgment is a drastic remedy and should be allowed only when the right of a moving party is clear and free from doubt.  
Jones v. Chicago HMO Ltd. of Illinois
, 191 Ill. 2d 278, 291, 730 N.E.2d 1119 (2000).  In considering a motion for summary judgment, all reasonable inferences must be drawn strictly against the moving party and liberally in favor of the opponent.  
Scardina v. Alexian Brothers Medical Center
, 308 Ill. App. 3d 359, 363, 719 N.E.2d 1150 (1999).  

Relative to their first contention, the defendants argue that Illinois law recognizes two "distinct types of products liability claims."  The first is a specific defect claim and the second is a nonspecific defect claim.  The defendants contend that in a specific defect claim, the plaintiff must allege that: (1) his injury resulted from a condition of the product; (2) the condition was unreasonably dangerous; and (3) the condition existed at the time it left the manufacturer's control.  
Pluto v. Searle Laboratories
, 294 Ill. App. 3d 393, 398, 690 N.E.2d 619 (1997).  In a nonspecific defect claim, the defendants claim that the plaintiff must allege that: (1) he was using the product in a normal manner; (2) there was no other reasonable cause for the product's failure to perform; and (3) the product failed to perform in a manner reasonably to be expected in light of its nature and intended function.  
Doyle v. White Metal Rolling & Stamping Corp.
, 249 Ill. App. 3d 370, 376, 618 N.E.2d 909 (1993).

The plaintiff's complaint reads in pertinent part:

   "2. That on or about October 3, 1996, a 'LifePorte' or 'Infus-a-Port' designed, manufactured, and sold by the defendants was surgically implanted in the Plaintiff's chest.  

   3. That the Defendants had a duty to design, manufacture and sell said device so that it would be reasonably safe for its intended use.

   4. That withstanding [
sic
] said duty, said device was defective when it left the control of the Defendants in one or more of the following respects:

   a.  A small leak in the device allowed the infiltration of chemicals into the Plaintiff's chest;

   b.  A failure of the device to operate as designed caused chemicals to infiltrate into the Plaintiff's chest;

   c.  A defect in the materials incorporated in said device caused chemicals to infiltrate into the Plaintiff's chest.  

   5.  That a direct proximate result of the leakage of chemicals into the Plaintiff's chest from said defect, the Plaintiff suffered severe and permanent personal injury, great pain and suffering, was cause [
sic
] to incur medical bills, to lose wages, and to be otherwise damaged."

The defendants argue that the complaint does not allege that the plaintiff was using the device properly, that there were no other reasonable causes for the device's failure and the product failed to perform in a manner reasonably to be expected in light of its nature and intended function.  Therefore, the plaintiff has pleaded a specific defect claim and should not be allowed to go forward on a nonspecific defect theory.  We disagree.  

In support of his position that this was not a proper case for summary judgment, Weedon cites to 
Tweedy v. Wright Ford Sales, Inc.
, 64 Ill. 2d 570, 357 N.E.2d 449 (1976), and 
Doyle v. White Metal Rolling & Stamping Corp.
, 249 Ill. App. 3d 370, 618 N.E.2d 909 (1993).  In 
Tweedy
, the plaintiff was injured when the brakes on an automobile manufactured and sold by the defendants failed.  
Tweedy
, 64 Ill. 2d at 572.  The plaintiff offered no expert testimony concerning a specific defect in the automobile's brake system.  
Tweedy
, 64 Ill. 2d at 572.  An insurance company representative and the owner of the parts yard examined the vehicle and testified that there was no evidence of leakage at the wheels and they heard the cable move when the parking brake was operated.  
Tweedy
, 64 Ill. 2d at 573.  An expert from Ford testified that the power "assist" on the automobile was too badly damaged, but tests on the master cylinder indicated no malfunction whatsoever.  
Tweedy
, 64 Ill. 2d at 573.  The defendant in 
Tweedy
 claimed that the plaintiff failed to prove that the automobile was defective at the time of the injury and when it left the defendant's possession.  
Tweedy
, 64 Ill. 2d at 573.  

The 
Tweedy
 court held that a 
prima
 
facie
 case that a product was defective and the defect existed when it left the control of the manufacturer is made by 
proof
 that, in the absence of abnormal use or reasonable secondary causes, the product failed to perform in the manner reasonably to be expected in light of its nature and intended function.  
Tweedy
 64 Ill. 2d at 574. 

In the 
Doyle
 case, the plaintiff filed a products liability action against the manufacturer of a ladder alleging that the ladder was unreasonably dangerous when the ladder collapsed, causing the plaintiff injury.  
Doyle
, 249 Ill. App. 3d at 373.  The defendant ladder manufacturer claimed that the plaintiff must point to some specific defect in the product.  
Doyle
, 249 Ill. App. 3d at 376.  The 
Doyle
 court, relying on 
Tweedy
, held that the plaintiff need not point to a specific defect, but may create an inference that a product was defective by direct or circumstantial evidence that: (1) there was no abnormal use of the product; (2) there was no reasonable secondary cause of the injury; and (3) the product failed to perform in the manner reasonably to be expected in light of its nature and intended function.  
Doyle
, 249 Ill. App. 3d at 377.  Although the 
Doyle
 court makes reference to a "'
Tweedy
' count" in the pleadings, we do not read these cases to hold that a plaintiff must plead anything other than that which is required in a products liability action but, rather, that plaintiff may establish a nonspecific defect claim by circumstantial evidence.  
Doyle
, 249 Ill. App. 3d at 377. 

Here, Weedon's position is that he pleaded the necessary elements of a products liability claim: (1) the product was defective; (2) the defect existed when it left the manufacturer's control; and (3) the product was unreasonably dangerous.  The depositions and other circumstantial evidence that he produced created the inference that there was no abnormal use, no reasonable secondary cause existed and the product failed to perform as reasonably expected in light of its nature and intended function.   

Accordingly, we find that the plaintiff's products liability action was properly pled.

II

The plaintiff asserts that summary judgment was not proper in the instant case because he presented evidence that tends to negate the other reasonable causes for his injury.  The defendants first suggest the possibility that an infection of the device was the cause of Weedon's injuries.  Relative to the issue of infection, Dr. Talamanti testified at deposition as follows:

   "Q.  Now, in this case you reached the conclusion at the time of the explant of Mr. Weedon's device that he exhibited the signs and symptoms of infection?

   A.  Correct.

   Q.  What was the basis for your conclusion?

   A.  I don't remember what his systemic signs were, but his local signs were that his Port-A-Cath had become tender, he had localized swelling and edema at the site.  And if I remember correctly, there was some redness associated at the site.

   Q.  Did the fact that you concluded that there was an infection around the port, around the venous access device in Mr. Weedon, mean to you that there was a defect in the device?

   A.  No.

   Q. Now when devices are infected, is it possible that one of the consequences is skin necrosis?

   A. That would have to be a particularly virulent type of skin infection.  We are using the word infection as a diagnosis for an indication for an operation.  The indication for the operation in this patient was localized inflamation.  An infection is a diagnosis that's usually established after the operation, and if the cultures are taken and organisms are seen on the stain.  The indications for this operation were localized inflamation.  The diagnosis is different and not always the same as the indications ***.

* * *

   Q. *** What are the signs and symptoms of extravasation?

   A. They are localized signs of inflamation.  The inflamation is usually more intense and it may be temporally related to the injection of chemotherapy agents. 

   Q. What are the possible causes of extravasation around a venous access device like the Life-Port device?

   A. Basically there is only two that I know of, and that's malfunction of the Port-A-Cath device or a mal-position of the needle during the infusion of chemotherapy.    

* * *

   Q. And what kind of tests would a pathologist do?

   A. They would look for blood clots.  They might culture the tip.  If you tell them that you were concerned about the flow or extravasation, they would do a dye study.

   Q. But it's correct that in this case you don't recall ordering that?

   A. No, because we took the device out, the concern for me wasn't extravasation, it was inflammation.  The diagnosis of extravasation was entertained when the patient continued to have persistent signs of skin infections, skin necrosis, then it wasn't any longer--and the cultures were negative, then it no longer became a simple case of an infected Port-A-Cath, the whole issue of extravasation and skin necrosis and chemotherapy was raised, and by that time the cultures had come back negative and the catheter had been discarded, so temporally it wasn't something that was an imperative at the time we removed the catheter.

* * *

   Q. Did you and Dr. Dumanian ever discuss what you thought the final diagnosis was on Brian Weedon?

   A. We did.

   Q. [A]nd what was that discussion about?

   A. I thought the cultures were negative, there was never any pus in the wounds--I mean the signs of infection you look for besides the clinical signs of inflammation, redness, tenderness, swelling, fever, the patient didn't have any of these things. *** Then we looked for the etiology of those symptoms, his cultures were negative, he had no pus in the wound, we couldn't find any signs of infection, then when he continued to show signs of skin inflammation and possible necrosis, then I think the one thing we cannot miss, we cannot make the error of omission by failing to recognize the fact that the etiology of his inflammation might have been extravasation.  

   Q. Now, you say the etiology might have been extravasation.  Did you ever reach a conclusion yourself with any kind of certainty about whether the cause of the need to explant the device was infection or extravasation?

   A. I reached a subjective impression that it was extravasation because the cultures were negative and there was no pus in the wound, and he didn't get better until we debrided the skin.  So I have to assume that it was extravasation, but I never have any--there is no test that I can tell you to confirm that it was extravasation other than it was an ongoing necrotizing process in his wound, and we never cultured out anything from his wound.  

   Q. Did you and Dr. Dumanian ever discuss the possible causes of the assumed extravasation?

   A. No, I don't think I ever discussed that.  I just said I think I he has extravasation, whether it came from mal-positioning of the needle, infusion in the wrong spot or a malfunction in the catheter, I don't think we discussed it.  We just discussed the indications; like I said, this thing is not getting better it is getting worse.  I can't find signs of infection."

When Dr. Talamanti was examined during deposition by the plaintiff’s counsel he testified as follows:

   "Q. Do you have an opinion based upon a reasonable degree of medical certainty whether it is more probably true than not true that Mr. Weedon had an extravasation injury than an infection?

   A. I think it is more probably true that he had an extravasation injury than an infection.  

   Q.  In this case, did you ever find any evidence that the Port-A-Cath was clotted?

   A. No, not that I recall.  

* * *

   Q. Would it be fair to say that the testing you did would not rule out the possibility that the device may have leaked?

   A. Correct."

Dr. Gordon was Weedon's oncologist.  He testified at deposition as follows:

   "Q. All right.  Now you mentioned in your answer if this is a case of extravasation.  What's your best judgment today about what happened to Brian Weedon and what his diagnosis was?

   A. My best guess is it was most likely extravasation rather than infection.  I couldn't be a hundred percent sure because both could give you the sort of tissue destruction that he had.  It's more typical I think with extravasation, but it's possible that it could have been infection.  We didn't--there isn't a good way to prove, I'm afraid, one or the other.

   Q. So?

   A. Removal of the device is the treatment for both.  My guess is, if I had to guess though, I would say extravasation over infection.

   Q. Why would you reach that conclusion?

   A. Well, because at least I don't recall seeing that there was any pus or obvious infection from the cite of the catheter.  I don't recall that he was having high fevers, which is one of the things you might see with infection, but maybe a little less likely with extravasation.  

* * *

   Q. So can you tell me all of the facts that would lead you to guess that Brian suffered from extravasation versus infection?  I ask that because the medical records don't reach that conclusion. 

   A. Right, I mean I think it's uncertain.  I'm just saying retrospectively likely what I think happened.  The reason I think it's more extravasation than infection is the extent of the tissue injury in the absence of any obvious pus described or high fevers.  I guess that would be the--that would lead me--if I had to choose one versus the other, but again, I could not be certain between the two.  It could have been infection.  

   [Deponent's attorney]: Just for the record, when you state it's not in the records that way, I just want to refresh the Doctor's recollection on one note because I think that is what you stated in the record.

   [The witness]: Should I read this?

   [Deponents' attorney]: Yeah.

   [The witness]: I again told him that I believe that most likely this represented a slow leak in the Port-A-Cath which resulted in extravasation, but infection certainly was a possible explanation for this, so I guess I felt the same way then."

Dr. Gordon also gave the following testimony regarding a letter that he wrote to Weedon's attorney:

   "Q. Take a look at Exhibit Number 1.  Do you recognize that document?

   A. Yes.

   Q. What is it?

   A. That's a letter to Mr. Baird from me indicating that--should I read it or just--indicating that I thought there was an extravasation injury that was caused by an undetected defect in the Port-A-Cath that allowed Ariamycin to infiltrate into the chest. 

   Q. You wrote Deposition Exhibit Number 1?

   A. Yes.

   Q. And that's your signature on Exhibit Number 1?

   A. Correct.

   Q. What exactly did you mean when you wrote about a, quote, defect in the Port-A-Cath, unquote?

   A. My intent was to refer to the inherent risk that I alluded to earlier that exists with any implanted venous access device.  That includes infection or extravasation.  So I was referring to the inherent risk.  It would be difficult for me to postulate what that was or how that was caused.  It is outside my realm of training, but I was referring to and understood the inherent risk of an intravenous access device.

   Q. Is it correct then that in writing the letter you were not referring to a defect in manufacture of the device?  

   A. Correct. 

   Q. And is it correct that you have no knowledge of a shortcoming in the manufacture of the Strato Lifeport device?

   A. Correct.

   Q. Is it also correct that in writing Deposition Exhibit Number 1 that you were not commenting on any defect in the design of the device of the device implanted in Mr. Weedon?

   A. Correct.  I had no basis to assess the design really.

   Q. Is it correct then that you have no basis for concluding that there was a defect in the design of the Strato Lifeport device?

   A. Correct.  My use of the word was to refer to the inherent risk of these devices in general.

   Q. Is it correct then that you don't know of a defect specific to the Strato Lifeport device that was implanted in Mr. Weedon."  

Dr. Dumanian gave the following testimony relative to the cause of Weedon's injury:

   "Q. [A]nd what was the nature of that surgery if you could describe it?

   A. The patient had a necrotic open wound ***.  ***.  He had approximately a three to four centimeter opening in his chest, and deep to [
sic
] that there was necrotic fat. By palpitation, one could feel that this necrotic process was not confined right to the incision but felt to be fairly substantial in terms of its size.  And I do remember talking to Mr. Weedon that I don't know how far out I have to go to take out all this dead fat.  But I do remember talking to him that it's at least from here to here, and all that tissue would need to be removed to start the healing process.  

* * *

   Q. Were there any complications connected with the surgery?

   A. No.

   Q. Now, we're referring to an IV--well, at some point in your notes there's a reference to an IV infiltration injury. 

   A. Yes.

   Q. Can you explain what that is, please?

   A. Yes.  When chemotherapy agents somehow end up in the subcutaneous tissues the high concentration of chemotherapy agents can kill the cells. The cell take up the IV agent, the chemotherapy agent kills the cells, the cells lyse releasing the agent back into the local tissue for the next level of cells to take up the chemotherapy.  And so you have a slowly spreading necrotic wound.  

   Q. How if at all is an extravasation different from an IV infiltration injury in your mind?

* * *

   A. I would use those terms synonymously.  

   Q. How, if at all, is an infection different from an IV infiltration injury in your mind?

   A. They are very different.  Infections have bacteria invading the local tissue causing a tissue response of pain, swelling, redness and systemic changes.  An IV infiltration injury could cause some of those things but they would look to a trained eye very different.  The wound of Mr. Weedon had been open for a while, and while there may have been bacteria on it, it did not seem to me to be an infected wound.  When I treated him, if I thought he had an infected wound I would have treated it much differently than the wound I saw.  An infected wound, typically one tries to get wound control opening up planes, relieving pus, taking out any dead tissue, but not trying to close the wound at that time.  So by my actions I felt it was one way and not another way.  

   Q. And the way you felt it was that--let me start again. What you felt had occurred was an IV infiltration injury and not an infection.

   A. At the time that I saw him and I was treating him, I did not think that this was an infected wound.  It may have been a colonized wound, but not an infected wound.  

* * *

   Q. Great. Can you tell us what this is, please?

   A. This is my operative report.  Dr. Talamanti had treated the infection by taking out the quote infected Port-A-Cath.  But the fact that the wound did not resolve in a way that a normal infection would makes one think, three weeks later I have the benefit of watching the history of the patient, because he didn't resolve it must be something else.  So what that refers to, there was a--there was apparent infection.  I'm referring to Dr. Talamanti's treatment of that wound.

   Q. Okay, and when you say that there was a question of IV infiltration injury, was there a question in your mind as of March 6, 1997, whether Mr. Weedon's injury was caused by an IV infiltration?

   A. When I say question, I refer to the fact that I don't know exactly what happened.  I have to make a guess.  And so I'm saying IV infiltration, but I don't know specifically.  I haven't talked--the only way I know there's an IV infiltration is if I know from the person who is delivering the medicine, 'I put in the medicine, all of a sudden the area got swollen and red and the patient told me there was pain.'  That's the only way I would know personally that an IV infiltration had occurred. 

   Q. Okay.  And I take it you did not know one way or another whether an IV infiltration injury had occurred as of March 6, 1997?

   A. That's correct.  And I still don't know exactly what caused this wound.  All I can do is say there was a wound, there was redness and pain on the skin.  Dr. Talamanti diagnosed an infection.  The way to treat an infection is to take out the foreign body.  The foreign body was removed, the wound did not get better, and so, therefore, I have to, with using what information I have, come up with a different diagnosis.  

   Q. Is it true today as well that you cannot and have not given any opinion as to what caused Mr. Weedon's injuries?

   A. That's not exactly correct.  I believe that it was an IV infiltration injury.  

   Q. Okay.

   A. I believe it was an IV infiltration.  Do I have proof it was IV infiltration?  I'll never have proof, but it acted like an IV infiltration injury.

   Q. Let me ask you slightly different question.  Do you have or have you ever given an opinion as to what caused the IV infiltration?

   A. Never.

   Q. Do you have a basis, any basis whatsoever, scientific or otherwise, for giving an opinion as to what caused the IV infiltration that you believe occurred with respect to Mr. Weedon?

   A. I have no opinion or idea how this happened.

   Q. Okay.  Have you ever told Mr. Weedon that you were not able to provide him with an opinion as to how the IV infiltration occurred?

   A. Yes.  I've actually said that to Mr. Weedon.  

   Q. Do you recall under what circumstances you did so?

   A. No.  But I do remember talking to him about  "You had an IV infiltration injury.  How it happened, I don't know." 

The defendants also argue that the plaintiff was unable to rule out medical mistakes as a possible cause for the extravasation of chemotherapy into Weedon’s chest.  Relative to that issue, Dr. Gordon testified as follows:

   "Q. The fact that everything seemed to have been done right from a medical point of view is one of the things that suggests that there must have been a leak in the catheter itself?

   A. Correct.  Everything was done, as far as I could see, right from a technical point of view from looking--from talking to Sarah and from looking at her notes.  It seemed perfectly done.

* * *

   Q. Sure.  By process of elimination we can eliminate medical care as a potential cause of extravasation?

   A. I believe so.

   Q. Which would leave the condition of the catheter itself?

   [Defendants' attorney]: Objection, foundation.

   [Plaintiff's attorney]: Correct?

   [The witness]: Correct.

* * *

   [Defendants' attorney]: You mentioned there were other potential causes of extravasation?

   A. One potential cause is simply not having the needle in the device.  The reason I don't believe this happened is you can't infuse--you can't infuse anything if that happened, and so I don't know how that could happen.  If you're infusing something into a dead end and not into the catheter you wont be able to infuse.  It's sort of a self-protective measure of the catheter.  You can't infuse if you're not in the right place.

   Q. What are other potential causes of extravasation?

   A. I think those are it.  Either some leakage or not having the needle--."

The plaintiff is not required to prove his claim at the summary judgment stage, but must present some facts to support his claim.  See 
Stewart v. B.F. Goodrich Co.
, 153 Ill. App. 3d 1078, 1081, 506 N.E.2d 783 (1987).  Based upon our review of the record in the case 
sub
 
judice
, we cannot say that the rights of the defendants are clear and free from doubt.  See 
Jones
, 191 Ill. 2d at 291.  Thus, we hold that trial court erred in granting defendants' motion for summary judgment.

III

The defendants also argue that the plaintiff did not demonstrate that the device failed to perform in a manner reasonably expected in light of its nature and intended function.  In the instant case, the venous access device was implanted in Weedon's chest for approximately four months with the expectation of delivering chemotherapy to the parts of Weedon’s body that were affected by the Hodgkin’s disease.  The plaintiff alleges the following in his complaint:

   "a.  A small leak in the device allowed the infiltration of chemicals into the Plaintiff's chest;

   b.  A failure of the device to operate as designed caused chemicals to infiltrate into the Plaintiff's chest;

   c.  A defect in the materials incorporated in [the] device caused chemicals to infiltrate into the Plaintiff's chest. 

   5.  That a direct proximate result of the leakage of chemicals into the Plaintiff's chest from [the] defect, the Plaintiff suffered severe and permanent personal injury, great pain and suffering
 *** ."

Although there was no witness produced by the plaintiff to testify as an expert regarding any specific defect in the venous access device, Sarah Coveny, the oncology nurse who administered the chemotherapy, testified that she used a specially designed "Port-A-Cath needle" and that she did not remember having any problems with Weedon's chemotherapy injections.  Dr. Talamonti testified that he inspected the device prior to and immediately after implantation and testified that there was no indication of any defects.  Although Dr. Dumanian, the plastic surgeon, did not see the Port-A-Cath through which the chemotherapy was given, he testified to the difference between an infection and an IV infiltration injury and, although he did not know exactly what happened, he testified that Weedon had an infiltration injury.  The defendants' expert, Mr. James Hagar, testified that a venous access device should not leak absent external forces, such as a medical mistake or use of an improper needle. 

After reviewing the record in the instant case, we cannot say that no issue of material fact exists.  Here, the evidence must be weighed by the finder of fact in order to determine whether the device failed to perform in a manner reasonably to be expected.  Thus, summary judgment is precluded.  
Stewart
, 153 Ill. App. 3d at 1081; see also 
Tweedy
, 64 Ill. 2d at 574 (explaining that an automobile driven 7,500 miles and inspected prior to purchase, inspected again 6,000 miles later and subjected to no abnormal use prior to total brake failure failed to perform in a manner reasonably to be expected).  

IV

Alternatively, defendants contend that the summary judgment may be affirmed on the ground that plaintiff sued the wrong defendant where: (1) defendants raised this issue in a separate summary judgment motion; (2) the undisputed evidence shows that neither of the defendants designed, manufactured or produced plaintiff's Lifeport device; and (3) the plaintiff sought to sue the actual manufacturer of the device only after defendants filed their summary judgment motion, despite having had express notice of his error more than 16 months beforehand.  However, the trial court did not reach the merits of the motion alleging that the defendants did not manufacture of the device at issue.

The defendants correctly point out that this court may affirm summary judgment on this ground or on any other basis in the record, regardless of whether the trial court relied on that ground or whether its reasoning was correct.  
Engelland v. Clean Harbors Environmental Services, Inc.
, 319 Ill. App. 3d 1059, 1062 747 N.E.2d 8 (2001).  However, we decline to affirm the trial court's grant of summary judgment in this case on an issue that the trial court did not reach.

For the foregoing reasons, the judgment of the circuit court is reversed and remanded for further proceedings.  

Reversed and remanded.

COHEN, P.J., and TULLY, J., concur.

FOOTNOTES
1:
Throughout the record and the parties' briefs, the terms "Port-A-Cath," "Lifeporte" and "Infus-A-Port" are used interchangeably by the witnesses and parties.