**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 210157-U

Order filed March 23, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| RICHARD L. CLEER, KATHY M. CLEER, NICHOLAS L. CLEER and KATHERINE S. CLEER, | ) ) ) ) | Appeal from the Circuit Court of the 9th Judicial Circuit, Fulton County, Illinois |
| Plaintiffs-Appellants, | ) ) | Appeal Nos. 3-21-0157 and 3-21-0003 Circuit No. 17-L-23 |
| JASON BURKS, TERRY BURKS, JMH UNLIMITED, INC., an Illinois corporation and UNKNOWN OWNERS, | ) ) ) ) | Honorable Bruce C. Beal, |
| Defendants-Appellees. | ) | Judge, Presiding |

PRESIDING JUSTICE O'BRIEN delivered the judgment of the court.
Justices Daugherity and Holdridge concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial court erred when it granted summary judgment in favor of defendant when genuine issues of material fact exist regarding the timing and cause of a new river channel and the legal descriptions regarding the parties' property lines in relation to the river.

¶ 2    Plaintiffs Richard L. Cleer, Kathy M. Cleer, Nicholas L. Cleer and Katherine S. Cleer (collectively the Cleers) brought this action to quiet title to land they own on the Spoon River. Defendant JMH Unlimited, Inc., (JMH), who owns the property across the river from the Cleers,

and defendants Jason Burks and Terry Burks, who are buying JMH's property on an installment contract, filed cross-complaints to quiet title. JMH filed a motion for summary judgment which the trial court granted. The Burks also filed a motion for summary judgment which remains pending. The Cleers appealed. We reverse the trial court's grant of summary judgment in favor of JMH and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4        Plaintiffs, the Cleers, own a parcel of land west of land owned by defendant JMH, who acquired the property in 2008. In 2012, James Hagemann, the owner of JMH, entered into an agreement to sell the land by contract deed to defendants Terry Burks and Jason Burks. That agreement remained ongoing with the Burks current on their payments.

¶ 5        The Spoon River separates the Cleer and JMH properties. Hagemann's property included a parcel which was surrounded by an oxbow channel (hereinafter the disputed parcel) through which the Spoon River used to flow. The disputed parcel was accessible through a land bridge on its eastern border which connected it with the remainder of JMH's property. Prior to the dispute in this case, the Spoon River ran to the east of the disputed parcel and the Cleers' property was located on the western shoreline of the river across from the disputed parcel. At some point, the river formed a new channel to the east of the Cleers' shoreline and the disputed parcel, eliminating a portion of the Cleers' riverfront access.

¶ 6        After the new channel formed, Hagemann, the Burks and the Cleers were all using the disputed parcel for recreational purposes and under claim of ownership. In July 2017, Nicholas Cleer noticed two tree stands on the disputed parcel and removed them, leaving a note with his contact information. Jason Burks called Nicholas and identified himself as the owner of the tree stands and of the disputed parcel.

2

¶ 7    The following month, the Cleers filed a complaint to enjoin JMH, Hagemann and Jason Burks from entering the disputed parcel and alleging abuse of process against Jason. The Cleers amended their complaint in September 2017, removing Hagemann individually and adding Terry Burks as a defendant. After the defendants' motion to dismiss was denied, JMH answered the complaint, asserted affirmative defenses, and filed a counterclaim seeking to quiet title and for ejectment. The Burks also answered, asserted affirmative defenses and filed a counterclaim to quiet title and for ejectment. The Cleers filed a second amendment complaint in which they also sought to quiet title.

¶ 8    Discovery depositions took place. Terry Burks testified that he was purchasing the 38-acre property from Hagemann on an installment contract for a warranty deed. His brother, Jason, was a co-purchaser. When Hagemann showed Terry the property, Hagemann told him that the land bridge to the disputed parcel had "blown out." Terry was aware there was erosion on both sides of the river. He had seen evidence of the Cleers' crops falling into the river and of erosion, although his parcel had not gained additional land. The camping spot on his land was eroding with the cliff washing into the river. The area floods every year. The new channel narrows and widens with the flow of the river and it is sometimes necessary to use a boat to access the disputed parcel. He entered the remainder of the property via an easement road to the east.

¶ 9    Jason Burks testified at his deposition that he and Terry used the land for recreational purposes, including hunting, fishing and camping. He was aware the property was enrolled in the Conservation Reserve Enhanced Program (CREP). He understood that the property line ran through the center of the "old dry creek bed" and "dead center around" the oxbow area. Friends who farmed in the area told him that the river changed course around 2010 over a three-year period. He did not personally see the river change course and did not know if the change was sudden. To

his knowledge, Mother Nature caused the new channel to form. When he and Terry bought the property in 2012, the river was approximately 50 feet in width between the western portion of their property and the disputed parcel. To access the disputed parcel, they walked across or rode a four-wheeler, depending on how much rain had fallen. The oxbow channel still became wet when the river flooded. He has seen water flow around the oxbow when the river was high. At those times, the disputed parcel became an island. He had seen the river flood more than six times. The river would flow out of its channel and back into the channel when the flood waters receded. He had noticed general erosion. He knew crops were falling into the river along the entire river.

¶ 10        Hagemann stated in his deposition that he was the president of JMH Unlimited and its sole shareholder. JMH bought the property, including the disputed parcel, via warranty deed with an easement access through the road east of the property. He wanted the property for recreational purposes, such as hunting, fishing and camping. He did not obtain a survey when he bought the property but representations were made regarding the boundaries. He understood the boundary followed the centerline of the Spoon River, the oxbow channel was the western boundary per the deed, and the new channel passed through his property. The deed he received from the prior owners indicated the western boundary of the property included the disputed parcel. After he entered the sale agreement with the Burks, he visited the property two or three times a year.

¶ 11        He had witnessed the river change course over the years. In addition, Hagemann said "There was a sudden—my land bridge got blown out, changed like that (snapped fingers). *** One day I walked across it, and one day I can't." He described the change in the river as sudden. There was a flood, everything was covered with water, and on his next trip to the property, the land bridge was gone. In Hagemann's view, a flood caused the land bridge to blow out. The event occurred within a two-year window, from 2010 to spring 2012, but could have been as early as fall

2009. He was unsure of the exact date. That was the only change he observed. He had no witnesses to corroborate the 2010 change in the river. In 2012, the river was 50 to 60 feet in width at the new channel and he would need a boat to access the disputed parcel. If the river was not high, he could walk to it. The river flooded at least once yearly and at certain water levels, it flowed through both the old and new channels, "essentially creating an island" of the disputed parcel.

¶ 12    Randy Stambaugh testified at his deposition. He was a prior owner of JMH's property having purchased it in January 2000. During his tenure as owner, the property was surveyed as part of CREP. He sold the property at a public auction five years after he bought it. He believed the river was the western boundary of the property per the deed. The river flowed through the oxbow channel when he owned the property. He did not see the river cutting through the land bridge but "you can tell the river was hitting there and trying to find its way through there." He was unaware of any sudden event that cut through the land. In his opinion, the property in dispute was part of the parcel he had owned. He sold it in 2004 and had not seen it since then. He did not know or remember whether the deed he gave the next owner had a different legal description than the description in the deed he received from the prior owner.

¶ 13    JMH moved for summary judgment in February 2019, arguing ownership of the parcel did not change with the formation of the new channel, and in the alternative, it owned the land by adverse possession based on tax payments The oxbow channel was the channel in which the river flowed. Attached to its motion were affidavits originally submitted by the Cleers with their response to the defendants' motion to dismiss filed in November 2017, all attesting that the river shifted course over the years at a "gradual rate," and that before the shift at issue, they considered the disputed parcel to be JMH's property but claimed they now owned the disputed parcel after the new channel was formed.

5

¶ 14    In their 2017 affidavits, the Cleers further attested that the eastern boundary of their property was the Spoon River, that they had observed the gradual, slow movement and shifting of the river over a number of decades, that the area was eroding, and that the new channel formed in 2011 or 2012 as a result of the river's gradual change and movement eastward. They all avowed that the new channel did not result from "a sudden or marked change in the shoreline." Prior to the new channel forming, they accessed the disputed parcel by boat and after the channel formed, they could access it by walking across the oxbow channel.

¶ 15    In response to the summary judgment motion, Richard Cleer and Nicholas Cleer submitted additional affidavits averring that Richard had observed the river gradually and slowly changing course over a 50-year period and Nicholas observed the same over a 20-year period. They both said the oxbow channel was filled in with trees and vegetation. Water was in the oxbow channel only during times of high water and floods. Richard attested that the land bridge area at one point had been 100 feet wide and could be farmed, and that there was gradual erosion from both sides of it. For several years, water covered the land bridge during periods of high water. Nicholas attested that in 2000, the land bridge was approximately 30 feet wide and that he had observed gradual erosion from both sides of it until 2011 or 2012 when the land narrowed and the new channel formed. Nicholas said before the new channel formed, the land bridge area would flood, then recede, while the river remained in the oxbow channel.

¶ 16    The trial court issued an opinion on January 17, 2020, granting summary judgment in favor of JMH on the second amended complaint and count I of JMH's counterclaim to quiet title. The court did not determine the adverse possession argument, concluding resolution was unnecessary. The trial court issued an order on March 5, 2020, granting summary judgment and finding ownership of the parcel remained with JMH. The Burks moved for summary judgment on March

6

30, 2020. The record does not reflect that the court ruled on the Burks' summary judgment motion. The Cleers filed an objection to the March 5, 2020, order, moved for reconsideration, and sought a Rule 304(a) ruling. Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). The trial court denied the Cleers' reconsideration motion on December 7, 2020. On March 23, 2021, the trial court amended its March 5, 2020, summary judgment order and on April 21, 2021, it modified the March 23, 2021, order. The Cleers appealed.

¶ 17                                II. ANALYSIS

¶ 18        On appeal, the Cleers argue that the grant of summary judgment to JMH was improper. They maintain factual disputes preclude summary judgment, that Illinois law does not authorize the court to strip them of their riparian rights, and that JMH has not established its ownership of the disputed parcel after the change in the course of the river. They challenge the trial court's finding that the new river channel formed as a result of an avulsion and submit instead that the new channel resulted from accretion.

¶ 19        Summary judgment is appropriate where the pleadings, depositions, admissions on file and affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018). The purpose of summary judgment is not to resolve issues of fact but to determine whether they exist. *Monson v. City of Danville*, 2018 IL 122486, ¶ 12. Summary judgment is a drastic means to resolve litigation and it should be allowed only when the movant's right is clear and free from doubt. *Id.* " '[W]here reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact.' " *Wausau Insurance Co. v. All Chicagoland Moving & Storage Co.*, 333 Ill. App. 3d 1116, 1120 (2002) (quoting *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107,

7

114 (1995)). In considering a summary judgment motion, the court draws all reasonable inferences liberally in favor of the non-moving party and strictly against the movant. *Weedon v. Pfizer, Inc.*, 332 Ill. App. 3d 17, 20 (2002). This court reviews a trial court's grant of summary judgment *de novo*. *Quality Transportation Services, Inc. v. Mark Thompson Trucking, Inc.*, 2017 IL App (3d) 160761, ¶ 24.

¶ 20        An accretion takes place where the shoreline gradually increases by "imperceptible accumulation." *Brundage v. Knox*, 279 Ill. 450, 462 (1917). The additional land belongs to the owner of the parcel on which it was deposited. *Id.* An avulsion takes place where a river suddenly abandons its old bed and forms a new bed. *Nebraska v. Iowa*, 143 U.S. 359, 361 (1892). When an avulsion occurs, the boundary remains the center of the old channel even when no water is flowing in it. *Id.* To establish an avulsion occurred, there must be a sudden event caused by the "violence of the stream" and the property at issue must be considerable. *Bellefontaine Improvement Co. v. Niedringhaus*, 181 Ill. 426, 438-39 (1899).

¶ 21        The trial court found that the "facts relative to the claim for possession made by both parties are not in dispute." According to the trial court, the dispute between the parties did not center on facts but on whether an avulsion or accretion took place. It found that an avulsion changed the course of the river and the common law applicable to avulsion dictated that ownership of the disputed parcel remained with JMH. The Cleers dispute that finding, maintaining the change in the course of the river was a slow and gradual process and that they own the disputed parcel based on the principal of accretion. The Cleers maintain that the western boundary of JMH's parcel remains the centerline of the Spoon River and that the boundary follows the course of the river as it changes. They challenge the trial court's conclusion, arguing that the requirements for an avulsion were not satisfied.

¶ 22 The Cleers also contest that summary judgment was appropriate, arguing factual disputes preclude the finding. We agree. In reaching its decision, the trial court determined factual issues. Its findings in support of summary judgment included that the United States Department of Agriculture (USDA) photographs established the new channel was formed between August 2009 and August 2010, that the new channel was caused by a freshet or flood, and that the oxbow channel was dried up. In addition, the trial court determined which of the conflicting legal descriptions applied to the property. The trial court resolved facts in dispute, a determination that is premature at the summary judgment stage. We find there are general issues of material fact that preclude summary judgment.

¶ 23 To begin, there are genuine issues of material fact regarding when the land bridge disappeared and the new channel formed. JMH claims, and the trial court agreed, that the new channel occurred as a result of a flood that Hagemann surmises occurred between 2009 and 2010. He credits a flood with causing the land bridge to disappear and the new channel to form. JMH points for support to the USDA photos that show the land bridge in 2009 and the new channel in its place in 2010. In contrast, the Cleers maintain the USDA photographs only depict a moment in time, that the river thereafter receded and the land bridge reappeared after the 2010 photo. They assert that the land bridge area had been slowly eroding for at least five decades. The Cleers all attested that they observed slow, gradual shifts and movement of the river eastward and they denied that the new channel formed as a result of a sudden event.

¶ 24 The additional affidavits of Richard Cleer and Nicholas Cleer in response to JMH's summary judgment motion further challenge the trial court's findings. Richard Cleer attested that he had observed the area of the land bridge eroding for 50 years and saw it reduced from a 100-foot, tillable area to a 30-foot area before disappearing when the new channel formed. Nicholas

9

Cleer attested that he had seen the area erode for the last 20 years. Stambaugh, who admittedly had not viewed the property since he sold it in 2004, stated that when he owned it, he was aware the land was eroding. He said he did not see the river cutting through the land bridge but could "tell the river was hitting there and trying to find its way through there." He was unaware of any sudden event that cut through the property and caused the new channel.

¶ 25    The trial court found the land bridge blew out as a result of a freshet or flood, which finding it apparently based on Hagemann's deposition testimony that the land bridge was there one day and then it was gone. Hagerman attributed that the event was likely due to flooding. However, Hagemann, Jason Burks, Terry Burks, and the Cleer family all stated that the area in question flooded on a regular basis and at least annually. Richard said the land bridge would be submerged during periods of high water. According to Terry, the channel narrowed and widened with the flow of the river. He described that his campsite on the disputed parcel was eroding and washing into the river. Jason testified that when the river floods, it flows out of its channel and then recedes. When he and Terry bought the property in 2012, the new channel was 50-feet wide. They either walked across it or rode four-wheelers to access the disputed parcel. Other times, they would use a boat to access the disputed parcel. These facts suggest that at times after 2012, the new channel was dry enough to cross. We do not consider that the facts establish without dispute that the new channel formed as a result of one flood.

¶ 26    According to the Cleers, the USDA pictures did not establish the new channel was permanent in 2010. In their affidavits, the Cleers place the formation of the new channel in 2011 or 2012. Hagemann surmises the new channel formed sometime in a two-year window between 2008 and 2010, with fall 2009 being the earliest date and the latest option being spring 2010. Meanwhile, Jason Burks stated that his local "farmer friends" said the river changed course over

10

a three-year period around 2010. The timing of the change in the river channel and what caused it are not free and clear from doubt. Both parties offer viable but opposing facts regarding when the new channel formed and why it formed.

¶ 27          The trial court further found that it was undisputed the oxbow channel was now dry. However, Hagemann and the Burks claim that the oxbow channel contained water at times when the river was high. Both Hagemann and Jason Burks attested that the oxbow channel became increasingly dry at low water but at high water, the disputed parcel would become an island with water in both the old and new channels. Richard Cleer, Kathy Cleer, Katherine Cleer, and Nicholas Cleer attested that the oxbow channel was dry with trees growing in it and indistinguishable from the surrounding land. Terry Burks also described the oxbow channel as filled with tall, skinny saplings. We conclude a dispute exists regarding these material facts that precludes the grant of summary judgment.

¶ 28          There is also a genuine issue of material fact regarding the legal descriptions depicting the boundary line of the parties' properties. The trial court, however, concluded that the metes and bounds description in the 2004 survey applied as the applicable legal description. The 2004 survey in metes and bounds measured the property line as ending "more or less" in the middle of the oxbow channel. ("thence leaving said levee toe and along said south line bearing South 88 degrees 51 minutes 20 seconds West, a distance of 945.67 feet more or less to the center line of Spoon River; thence along said center line for the next 21 courses"). In contrast, the prior deeds to the JMH property indicated the boundary as the center of the Spoon River. ("running thence West to the center of the channel of Spoon River at low water mark thence following the course or meanderings of said stream"). Additionally, the Cleers' deed and the chain of deeds before their ownership indicate the property line as the west bank of the river. ("running thence East to the

11

West bank of Spoon River at low water mark, thence in a Southwesterly direction along the West bank of Spoon River following the meandering of the course of said river at low water"). The discrepancy in the legal descriptions is also a genuine issue of material issue of genuine fact we find prevents summary judgment. In concluding the 2004 legal description should apply, the trial court improperly resolved factual disputes.

¶ 29     We find the grant of summary judgment in favor of JMH was improper. Genuine issues of material fact exist such that the trial court's determination that ownership of the disputed parcel remained with JMH was not free and clear from doubt. Because the Burks' motion for summary judgment remains pending, we do not address it.

¶ 30                                    III. CONCLUSION

¶ 31     For the foregoing reasons, the judgment of the circuit court of Fulton County is reversed and the cause remanded.

¶ 32     Reversed and remanded.